FILED

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**MIDDLE DIVISION**

99 JUN -8 PM 2:28

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|     and | ) |
| | ) |
| JERRY WILLIAMS, L.E. McGRIFF, and | ) |
| HERBERT PATTERSON, | ) |
| | ) |
|     Intervenors, | ) |
| | ) |
|     v. | )   CV-97-BU-2755-M |
| | )   **ENTERED** |
| GULF STATES STEEL, INC. | ) |
| | )   JUN 0 8 1999 |
|     Defendant. | ) |

Memorandum Opinion

The United States brought this action on behalf of the Administrator of the Environmental Protection Agency ("EPA") against Gulf States Steel, Inc. ("GSSI"), alleging violations of the Federal Water Pollution Control Act, also known as the Clean Water Act ("FWPCA or "Clean Water Act"), 33 U.S.C. § 1251, et seq. Jerry Williams, L.E. McGriff, and Herbert Patterson intervened in the action, aligned on the plaintiff's side. Now before the Court are cross-motions for partial summary judgment, filed by the United States and GSSI. In its motion, the United States seeks an Order holding that GSSI is liable for 1000 violations of its National Pollution Discharge Elimination System ("NPDES") permit from May 1, 1995 to September 30, 1998, comprising 4,290 days of violation. (Doc. 43). GSSI responds that the partial summary judgment sought by the United States does not lie against it because a

55

substantial number of GSSI's permit violations were caused, GSSI contends, by "single operational upsets" that should be counted as a single violation under 33 U.S.C. § 1319(d). In addition, GSSI argues in its motion for partial summary judgment that it is entitled to an Order holding that the United States cannot bring an enforcement action under the Clean Water Act for a substantial number of other alleged violations, which are based upon permit effluent limitations for outfalls located along GSSI's internal wastewater treatment system. (Doc. 51). The United States and GSSI have briefed their cross-motions and filed evidence in support of their respective positions.    The motions are now ripe for decision, and, upon due consideration, the Court concludes that the United States motion for partial summary judgment on the issue of GSSI's liability for the 1000 violations, comprising 4,290 days of violation, is due to be GRANTED, and the GSSI motion for partial summary judgment is due to be DENIED.

SUMMARY JUDGMENT STANDARD

Summary judgment provides the parties an invaluable opportunity to test the mettle of a case before it ever reaches trial. On a motion for summary judgment, the court assesses all of the proof the parties can bring to bear in order to ascertain whether a genuine need for trial is present. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Summary judgment is weighed heavily in favor of the non-movant; it is appropriate only if the court concludes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A party seeking summary judgment has the initial responsibility of informing this court of the grounds for its motion and specifically identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it believes demonstrate the absence of a genuine issue of material fact. Id. at 323. The movant's burden is not meager; it must illuminate for the court the reasons why the non-movant cannot raise a genuine issue

of material fact sufficient to support a trial.

Once the moving party has satisfied this initial burden, however, the nonmoving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." Howard v. BP Oil Company, 32 F.3d 520, 523 (11th Cir. 1994). Rule 56(e) requires the nonmoving party to "go beyond the pleadings" and by "affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts'" showing there exist genuine issues for trial. Celotex, 477 U.S. at 324; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988). "Tenuous insinuation" and empty speculation based on loose construal of the evidence will not satisfy the non-movant's burden. Cf. Mesnick v. General Elec. Co., 950 F.2d 816, 820 (1st Cir. 1991), cert. denied, 504 U.S. 985 (1992).

While the court may consider the offered "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any" in deciding whether to grant or deny a summary judgment motion, FED. R. CIV. P. 56(c), the Rule "saddles the non-movant with the duty to 'designate' the specific facts in the record" supporting its claims. Jones v. Sheehan, Young & Culp, P.C., 82 F.3d 1334, 1338 (5th Cir. 1996). "Rule 56 . . . does not impose upon the district court a duty to survey the entire record in search of evidence to support a non-movant's opposition." Id. See also Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir.) (en banc) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment."), cert. denied, 516 U.S. 817 (1995).

In resolving whether a given factual dispute requires submission to a jury, the court must inspect the presented evidence through the looking glass of each party's substantive evidentiary burden. Anderson, 477 U.S. at 254-55. The court, however, must avoid weighing conflicting evidence for probity or making credibility determinations. Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992). "It is not part of the court's function, when deciding a motion

for summary judgment, to decide issues of material fact, but rather decide whether such issues exist to be tried. The Court must avoid weighing conflicting evidence or making credibility determinations." Hairston v. Gainesville Sun Publishing Co., 9 F.3d 913, 919 (11th Cir. 1993). At the same time, "[t]he nonmoving party must provide more than a mere scintilla of evidence to survive a motion for judgment as a matter of law; 'there must be a substantial conflict in evidence to support a jury question.'" Tidwell v. Carter Products, 135 F.3d 1422, 1425 (11th Cir. 1998) (citing Carter v. City of Miami, 870 F.2d 578, 581 (11th Cir. 1989)).

The Court will now proceed to consider the application of the foregoing standards to the evidence presented in this case.

### BACKGROUND & FACTS[1]

Congress passed the Clean Water Act in order "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251. To that end, the Clean Water Act prohibits the discharge of pollutants into the navigable waters of the United States, unless one of several exceptions applies. 33 U.S.C. § 1311(a). One such exception is where a polluter has been issued an NPDES permit. 33 U.S.C. § 1342. Once issued, the permit defines the holder's obligations under the Act. A state agency may be given the authority to administer the NPDES permit system if the state regulatory scheme meets certain criteria, § 1342(b), although the EPA retains the ability to veto the issuance of a proposed state permit, § 1342(d)(2). Alabama has established an EPA-approved program whereby the Alabama Department of Environmental Management ("ADEM") is responsible for issuing

---

[1]"The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the record. These are the 'facts' for summary judgment purposes only. They may not be the actual facts. See Cox v. Administrator U.S. Steel & Carnegie, 17 F.3d 1386, 1400 (11th Cir. 1994)." Underwood v. Life Ins. Co. of Georgia, 14 F.Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998). Of course, with respect to the United States motion for partial summary judgment the evidence must be viewed in the light most favorable to GSSI, and, conversely, the evidence must be viewed in the light most favorable to the United States with respect to the GSSI motion.

NPDES permits in Alabama, pursuant to the Alabama Water Pollution Control Act ("AWPCA"), §§ 22-22-1, et seq. See §§ 22-22-9(g), § 22-22A-5(10), Ala. Code 1975; Ala. Admin. Code R. 335-6-6-.01. The holder of a state NPDES permit is subject to both federal and state enforcement for failure to comply with its terms. 33 U.S.C. §§ 1319, 1342(b)(7), 1342(i).

GSSI owns and operates an integrated steel manufacturing facility (the "facility") in Gadsden, Alabama. GSSI was formed on or about April 21, 1995, in order to receive the assets of the facility, acquired by new owners.[2] As a result of the facility's operation, GSSI discharges various pollutants into Black Creek, which the parties agree is a navigable water of the United States in Etowah County, Alabama. GSSI is thus subject to the Clean Water Act. On December 4, 1987, ADEM issued an NPDES permit ("the 1987 permit") to GSSI's predecessor in interest as owner and operator of the facility. The 1987 permit was effective from its date of issuance until December 3, 1992, and it authorized the operator of the facility to discharge pollutants into Black Creek from a single outfall, 001. Under the 1987 permit, the discharger was required to monitor this outfall for various characteristics, including pH and temperature, and for the concentration of certain pollutants, such as dissolved oxygen, total suspended solids, ammonia nitrogen, and zinc; the discharger was to submit the results in monthly

---

[2]According to GSSI's Answer, a corporation called Gulf States Steel, Inc. of Alabama ("Old Gulf States"), legally distinct from GSSI, transferred its assets to another corporation, GSS Acquisition Corp., on or about April 21, 1995, under the terms of an asset purchase agreement dated January 13, 1995. Subsequent to this asset transfer, and pursuant to the terms of the asset purchase agreement, Old Gulf States removed all references to "Gulf States" from its corporate name and relinquished its rights to the name "Gulf States Steel of Alabama." GSS Acquisition Corp. then changed its name to "Gulf States Steel, Inc. of Alabama." It is this corporate entity that is the defendant in this action, GSSI. See GSSI's Answer ¶ 13. The United States seems to harbor some doubts as to whether this transfer of ownership from Old Gulf States Steel to GSSI was bona fide, as the United States refers to the transaction as "the supposed transfer in ownership . . . ." United States Reply Memorandum in Support of its Motion for Summary Judgment and In Opposition to Defendant's Cross Motion for Summary Judgment ("United States Reply Brief") at 3. But in any event, in its motion for partial summary judgment, the United States does not seek to hold GSSI liable for any Clean Water Act violations that may have occurred while the facility was owned and operated by Old Gulf States, although the United States has reserved its right to do so.

discharge monitoring reports ("DMRS") to ADEM. In addition, the 1987 permit required the discharger to abide by certain effluent limitations, restricting the concentration of specified pollutants from outfall 001.

On September 28, 1994, ADEM issued a new NPDES permit ("the 1994 permit"), effective from October 1, 1994, until September 30, 1999, to GSSI's predecessor in interest at the facility.[3] The 1994 permit, like the 1987 permit, authorized direct discharges into Black Creek through outfall 001, subject to certain monitoring and reporting requirements and subject to a number of effluent limitations. However, the 1994 permit also imposed conditions upon the discharger with respect to six additional outfalls: 001A, 001B, 001C, 001D, 002 and 003. Unlike outfall 001, the additional outfalls listed in the 1994 permit do not empty directly into Black Creek; they are instead located at various points along the facility's internal wastewater treatment system.[4] While still within the boundaries of the facility, the waters from the six outfalls aside from outfall 001 combine and mix with each other and other streams until they ultimately terminate in a holding pond, also inside the facility, where all the facility's wastewater collects before it is discharged directly into Black Creek through outfall 001. Thus, notwithstanding that all the wastewater generated by the facility's operation enters Black Creek

---

[3]ADEM administratively extended the applicability of 1987 permit until the issuance of the 1994 permit.

[4]The 1994 permit describes the flow of the seven outfalls as follows:
"DSN001: Process wastewater, cooling water and storm water from integrated manufacturing facility."
"DSN001A: Treated process wastewater from coke plant [waste water treatment plant], prior to mixing with other streams."
"DSN001B: Coal pile runoff and storm water from coal unloading/storage area."
"DSN001C: Combined process wastewater from basic oxygen furnace, continuous caster, acid pickle line, galvanize rinse and galvanize line, tandem mill and tempter mill following treatment and prior to re-use or mixing with other wastes prior to discharge to the south ditch."
"DSN001D: Combined process wastewater from the plate mill, blooming mill and hot strip mill following the mixing of these wastestreams and prior to their combining with other streams."
"DSN002, 003: Storm water from steel manufacturing facility and industrial landfill."

only from outfall 001, the permit establishes independent requirements for all seven outfalls. More specifically, the 1994 permit requires monitoring and reporting on all seven outfalls and demands adherence to effluent limitations with respect to outfalls 001, 001A, 001C, and 001D.[5] The 1994 permit also provides:

> The permittee must comply with all conditions of this permit. Any permit noncompliance constitutes a violation of the AWPCA and the FWPCA and is grounds for enforcement action, for permit termination, revocation and reissuance, suspension, modification; or denial of a permit renewal application.[6]

Beginning on November 29, 1994, the GSSI's predecessor obtained various stays of certain parameters of its 1994 permit. Pursuant to one stay, the operator of the facility was not required to comply with the 1994 permit's effluent limitations on zinc discharges, but was instead mandated only to adhere to the zinc effluent limitations contained in the 1987 permit, until September 1, 1996.[7] Similarly, the 1994 permit's discharge limits for outfall 001D were

---

[5]In its brief, GSSI seems to allege that the 1994 permit "by its terms" imposes only "monitoring" requirements at outfalls 001A, 001C, and 001D, not effluent limitations. See GSSI's Brief in Opposition to the United States Motion for Partial Summary Judgment and In Support of GSSI's Motion for Partial Summary Judgment ("GSSI's Brief") at 16. However, the Court notes that the 1994 permit unquestionably imposes specific "discharge limitations" on pollutants in specific amounts, not just monitoring requirements. At outfall 001, the 1994 permit's effluent limitations on pollutants are generally expressed in terms of concentration (mg/l or ug/l), while at outfalls 001A, 001C, and 001D, the limitations are generally expressed in terms of absolute quantities per day (lbs./day). The 1994 permit does establish a monitoring requirement at outfalls 002 and 003 for nine effluent characteristics, but an effluent limitation exists for only one of these: pH. The 1994 permit does not specify any effluent limitations with respect to the outfall 001B, although GSSI is required to monitor three effluent characteristics. In its motion for partial summary judgment, the United States does not allege that GSSI violated any conditions or limitations of the 1994 permit with respect to outfalls 001B, 002, or 003.

[6]The 1987 permit contains a similar provision.

[7]The daily maximum zinc level for outfall 001 is actually more stringent in the 1987 permit: in the 1987 permit, the zinc limitation was 180.0 ug/l; the 1994 permit zinc limitation was 197.1 ug/l. However, the 1994 permit also included a monthly average limitation for zinc, whereas the 1987 permit did not. For the purposes of its motion, the United States does not include any zinc monthly violations prior to September 1996, when the stay on the 1994 permit's zinc limitations granted by ADEM expired.

stayed until July 12, 1995, and the discharge limits for outfall 001C were stayed until mid-April 1996.[8]

Upon GSSI's formation in April 1995, and immediately after the closing of the acquisition of the assets of the facility, the 1994 permit was transferred to GSSI. This was accomplished by an exchange of letters between GSSI and ADEM. See Ala. Admin. Code R. 335-6-6-.17(a). Thus, GSSI was allowed by law to discharge into Black Creek, subject to the same permit terms, conditions, and limitations imposed upon its predecessor.

On October 17, 1997, the United States filed this action against GSSI on behalf of the Administrator of the EPA, pursuant to 33 U.S.C. § 1319(b), seeking civil penalties and injunctive relief. The complaint alleges GSSI discharged pollutants into Black Creek in violation of the effluent limitations set forth in NPDES permits, and that GSSI had, therefore, discharged pollutants into the navigable waters of the United States in violation of 33 U.S.C. § 1311 of the Clean Water Act. On February 5, 1999, the United States filed its motion for partial summary judgment, and on March 31, 1999 GSSI filed its motion for partial summary judgment.

### CONTENTIONS & ANALYSIS

Under 33 U.S.C. § 1311(a), "the discharge of any pollutant by any person" is unlawful, if the discharge violates the terms of an applicable NPDES permit. 33 U.S.C. § 1362(12)(A) defines a "discharge of a pollutant" as "any addition of any pollutant to navigable waters from any point source." The term "navigable waters" is, in turn, defined as "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7). Thus, in order to establish a violation of 33 U.S.C. § 1311(a) in this enforcement action, the United States must show that (1) a person (2) discharged a pollutant into the waters of the United States from a point source and that (3) the discharge violated the terms of the applicable NPDES permit. See United

---

[8]For the purposes of its motion, the United States does not include any violations at outfall 001D prior to July 12, 1995, nor any violation at outfall 001C prior to April 19, 1996.

States v. Smithfield Foods, Inc., 965 F.Supp. 769, 781 (E.D. Va. 1997); United States v. Aluminum Co. of America, 824 F.Supp. 640, 647 (E.D. Tex. 1993); Michigan v. City of Allen Park, 501 F.Supp. 1007, 1014 (E.D. Mich. 1980), aff'd, 667 F.2d 1028 (6th Cir. 1981), cert. denied, 456 U.S. 927 (1982).

The United States claims it is entitled to partial summary judgment as to GSSI's liability under the Clean Water Act for violations of the effluent limitations of its NPDES permit that occurred between May 1, 1995 and September 30, 1998. The United States points out that GSSI does not dispute that GSSI is a "person" for the purposes of the Clean Water Act.[9] The United States also states that GSSI does not challenge that Black Creek is a water of the United States or that GSSI discharges of wastewater into Black Creek from a point source. The United States further argues that the evidence conclusively establishes that GSSI is liable for 1000 violations of its NPDES permit effluent limitations for outfalls 001, 001A, 001C, and 001D during the relevant period.[10] These violations, the United States maintains, constitute 4,290 days of violation and are manifest in GSSI's monthly DMRS for the period in question. In support of its motion for summary judgment, the United States has filed these DMR's and the 1987 and 1994 permits governing the facility's discharges.

### A. Enforceability of Effluent Limitations Upon Internal Waste Streams

In response to the United States motion for partial summary judgment, GSSI acknowledges that its DMR's indicate that the permit effluent limitations for outfalls 001,

---

[9]The Clean Water Act's definition of the term "person" specifically includes a "corporation." 33 U.S.C. § 1362(5).

[10]The 1000 specific violations are set out in Attachment 1 to the affidavit of John Moore, filed by the United States in support of its motion for summary judgment. That attachment shows that the 1000 alleged violations are broken down by outfall as follows:

> outfall 001:   763 alleged violations;
> outfall 001A:  60 alleged violations;
> outfall 001C:  64 alleged violations;
> outfall 001D:  113 alleged violations.

001A, 001C, and 001D have been exceeded on the occasions alleged by the United States. GSSI also seems to concede, correctly, that its DMRS for the relevant period are sufficient to conclusively prove that the permit effluent limitations in question were violated.[11]  However, in its brief in support of its own motion for partial summary judgment and in opposition to the United States motion, GSSI first argues that it cannot be liable under the Clean Water Act based upon the permit effluent limitations on outfalls 001A, 001C, and 001D because those outfalls are located on internal wastewater streams within the facility.  GSSI acknowledges that outfall 001 does discharge into a water of the United States,[12] i.e., Black Creek.  GSSI also concedes that the streams from outfalls 001A, 001C, and 001D do eventually flow into Black Creek through outfall 001, after they have collected in the facility's wastewater lagoon.  However, GSSI claims that the outfalls from 001A, 001C, and 001D themselves are not discharges into waters of the United States, and therefore, GSSI asserts, the United States cannot enforce the permit effluent limitations with regard to these outfalls.

The United States volleys in reply to this argument by claiming that GSSI is improperly attempting to challenge its obligations under its NPDES permit.  The United States first contends that if GSSI wanted to dispute the terms or conditions of its NPDES permit with

---

[11]See Atlantic States Legal Foundation v. Tyson Foods, Inc., 897 F.2d 1128, 1135 (11th Cir. 1990)("The DMRs filed by [the defendant] for the months of May 1986 to February 1988 conclusively establish the existence of ongoing violations.  Thus, [the plaintiff] has established liability under the Clean Water Act . . . .")(emphasis added); accord Sierra Club v. Simkins Industries, Inc., 847 F.2d 1109, 1115 n.8 (4th Cir. 1988)(DMRs may be used as admissions in court to establish a defendant's liability), cert. denied, 491 U.S. 904 (1989); Sierra Club v. Union Oil Co. of California, 813 F.2d 1480, 1491-92 (9th Cir. 1987)(DMRs are conclusive evidence of a permit violation), vacated and remanded on other grounds, 485 U.S. 931 (1988).

[12]GSSI concedes that because outfall 001 does empty into a navigable waterway, GSSI will have some liability based upon violations of permit effluent limitations connected directly to that source.  However, GSSI argues summary judgment establishing its liability is not appropriate even for the discharges from outfall 001 because, GSSI claims, genuine issues of material fact exist as to how many of the violations from that outfall are the result of "single operational upsets," affecting the number of violations for which GSSI would be liable.  The Court will address this issue in text below.

regard to any aspect of effluent limitations on the internal waste streams measured at outfalls 001A, 001C, and 001D, the proper procedure, the United States claims, would have been to apply for federal review in the United States Court of Appeals for the Eleventh Circuit, pursuant to 33 U.S.C. § 1369(b)(1), which provides for "[r]eview of the Administrator's action . . . (F) in issuing or denying any permit under [33 U.S.C. § 1342]." Since there was no challenge under § 1369(b)(1) to the validity of the internal waste stream effluent limitations, GSSI, the United States maintains, is precluded from litigating their validity in this action by § 1369(b)(2), which provides, "Action of the Administrator with respect to which review could have been obtained under [§ 1369(b)(1)] shall not be subject to judicial review in any civil or criminal proceeding for enforcement." By failing to challenge its permit in an agency proceeding at the appropriate time, the United States asserts, GSSI has lost "forever the right to do so, even though that action might eventually result in the imposition of severe civil or criminal penalties." Texas Mun. Power Agency v. EPA, 836 F.2d 1482, 1484-85 (5th Cir. 1988), quoting Texas Mun. Power Agency v. EPA, 799 F.2d 173, 175 (5th Cir. 1986).

However, in Save the Bay, Inc. v. EPA, 556 F.2d 1282, 1291-92 (5th Cir. 1977), which is binding precedent upon this Court,[13] it was held that permits granted under state NPDES programs are state-issued permits, not EPA-issued, and the Court of Appeals has no original jurisdiction under § 1369(b)(1) to consider a petition challenging the terms of a state-issued permit.[14] The Court notes that the permits in this case were "issued" by ADEM, not the EPA, under the permit program established by the state of Alabama under 33 U.S.C. § 1342(b).

---

[13]In Bonner v. City of Prichard, 661 F.2d 1106 (11th Cir. 1981) (en banc), the United States Court of Appeals for the Eleventh Circuit adopted as binding precedent decisions of the Fifth Circuit handed down prior to October 1, 1981. See Limelight Productions, Inc., v. Limelite Studios, Inc., 60 F.3d 767, 769 n. 1 (11th Cir. 1995).

[14]But see Crown Simpson Pulp Company v. Costle, 445 U.S. 193, 197 n.9 (1980), holding that § 1369(b)(1) does confer jurisdiction upon a circuit court of appeals to hear a challenge to an EPA's decision under 33 U.S.C. § 1342(d)(2) to veto the issuance of a state NPDES permit, and indicating that Save the Bay was distinguishable.

Therefore, the terms and conditions of the permits were not subject to federal review upon issuance under § 1369(b)(1). Under the plain language of § 1369(b)(2), an alleged violator is prohibited from litigating the terms of its NPDES permit in an enforcement action only if the alleged violator chose to forego review available under § 1369(b)(1). Because such review was not available here, the Court does not believe that § 1369(b)(2) applies to prohibit GSSI from litigating the terms of the state-issued NPDES permits. Accord United States v. City of Geneva, 1986 WL 7664 (N.D. Ill 1986); see also NRDC v. Outboard Marine Corp., 702 F.Supp. 690, 693 (N.D. Ill. 1988) (recognizing that § 1369(b)(2) "expressly bars review of an EPA-issued or EPA-denied permit in any District Court enforcement proceeding.") (emphasis added); but see General Motors Corp. v. EPA, 168 F.3d 1377, 1382-83 (D.C. Cir. 1999)(holding that the EPA was not unreasonable in interpreting the CWA to preclude the defendant from collaterally attacking the validity of its state-issued NPDES permit in an EPA administrative penalty enforcement proceeding under 33 U.S.C. § 1319(g)).

The United States argues in the alternative that GSSI is prevented from now contesting its permit's effluent limitations on the internal waste streams because neither GSSI nor its predecessor, which was the original grantee of both the 1987 and 1994 permits, availed itself of administrative and judicial review available under Alabama state law. The Court agrees. Section 22-22A-7(c)(7), Ala. Code 1975, provides that any person who is "aggrieved by an administrative action of [ADEM]" is entitled to a hearing before the Environmental Management Commission ("EMC"), an administrative body that has the duty to, among other things, hear and determine appeals of administrative actions. See § 22-22A-6(a)(4), Ala. Code 1975. Request for such a hearing to contest an administrative action, other than the issuance of any rule or regulation or emergency order, must be filed with the EMC within 15 days after notice to the aggrieved person by ADEM of its action. Section 22-22A-7(c)(1), Ala. Code 1975. The issuance of an NPDES permit pursuant to § 22-22-9(g), Ala. Code 1975, is an agency "action" within the meaning of § 22-22A-7. See, e.g., Ex parte Fowl River Protective

Ass'n, Inc., 572 So. 2d 446 (Ala. 1990); Ex parte Marshall Durbin & Co. of Jasper, Inc., 537 So. 2d 496 (Ala. 1988). An order of the EMC modifying, approving, or disapproving ADEM's action is a final administrative action and is subject to judicial review. § 22-22A-7(c)(6), Ala. Code 1975. Significantly, Alabama state law, like 33 U.S.C. § 1369(b)(2), expressly prohibits an alleged CWA violator from collaterally attacking the terms of its permit in an enforcement proceeding; § 22-22A-7(c)(7), Ala. Code 1975, provides: "Administrative action with respect to which review was or could have been obtained under [§ 22-22A-7] shall not be subject to judicial review in any civil or criminal proceeding for enforcement." It is undisputed that neither GSSI nor its predecessor challenged the terms of the permits issued by ADEM. "By failing to challenge its NPDES permit under state law at a time when its purported legal deficiency should have been as apparent to the defendant as it is now, the defendant is precluded from doing so in this action." Connecticut Fund for the Environment v. Job Plating Co., Inc., 623 F.Supp. 207, 216 (D. Conn. 1985); see also Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 956 F.Supp. 588, 597-98 (D. S.C. 1997)(discussing the purposes and legislative history behind precluding collateral attacks on NPDES permits in enforcement proceedings), vacated on other grounds, 149 F.3d 303 (4th Cir. 1998), cert. granted, 119 S.Ct. 1111 (1999); PIRG v. Powell Duffryn Terminals Inc., 913 F.2d 64, 78 (3rd Cir. 1990); PIRG v. Yates Industries, 757 F.Supp. 438, 445-46, reconsideration denied in part and granted in part on other grounds, 790 F.Supp. 511 (D. N.J.1991).

Next, GSSI contends its arguments assailing the effluent limitations on internal waste stream outfalls do not, in fact, constitute an impermissible collateral attack upon the terms of its permit in this enforcement proceeding. Rather, GSSI claims that it is merely challenging the "enforcement" of the internal waste stream effluent limitations by the United States. That is, GSSI asserts, it is merely contesting here whether the discharges from outfalls 001A, 001C, and 001D were made into "waters of the United States," an element of liability under the Clean Water Act. In support of its argument that the internal waste streams of the facility are not

waters of the United States, GSSI points to 40 C.F.R. § 122.2, which states in relevant part,
"Waste treatment systems, including treatment ponds or lagoons designed to meet the
requirements of the [Clean Water Act] . . . are not waters of the United States."

GSSI cites no case recognizing the distinction between challenging the "enforcement"
of an NPDES permit and challenging the terms and obligations of the permit itself, and the
Court is unable to find any such authority even suggesting such a distinction exists. Whatever
the merits of GSSI's argument,[15] the Court concludes that GSSI's failure to timely petition for
review of the permit precludes GSSI from attacking the obligations imposed upon it by its
permit. "In short, [an NPDES] permit defines, and facilitates compliance with, and
enforcement of, a preponderance of a discharger's obligations under the [Clean Water Act.]"
EPA v. California ex rel. State Water Resources Control Bd., 426 U.S. 200, 205 (1976).
Thus, some courts have gone so far as to suggest that permits that have not been timely disputed
upon issuance can actually impose liability upon the holder for discharges that might have been
lawful in the absence of the permit. See, e.g., United States v. Saint Bernard Parish, 589
F.Supp. 617 (E.D. La. 1984)(where the Court concluded that a permit holder was liable for

---

[15]The Court notes that GSSI continuously attacks the EPA's authority to establish effluent
limitations on internal wastewater streams. However, it should be recognized that the effluent limitations
on GSSI's wastewater streams were established by ADEM, not the EPA. The Clean Water Act expressly
provides that a state may adopt standards and limitations respecting discharges of pollutants that are more
stringent than those imposed under the Clean Water Act. 33 U.S.C. § 1370. Thus, even if the EPA lacks
the authority to impose effluent limitations upon internal wastewater streams, which is not the majority
position in the United States Courts of Appeals, compare Texas Mun. Power Agency v. EPA, 836 F.2d
1482 (5th Cir. 1988), and Public Service Co. of Colorado, Fort Vrain Station v. EPA, 949F.2d 1063 (10th
Cir. 1991), with American Iron and Steel Inst. v. EPA, 115 F.3d 979, 995-96 (D.C. Cir. 1997), ADEM
would at least arguably still be able to impose such effluent limitations under § 1370. Alabama law
provides for the imposition of effluent limitations upon internal waste streams. See Ala. Admin. Code.
Reg. 335-6-6-.15(8). Even if it might be argued that ADEM exceeded its authority either in enacting
regulations authorizing effluent limitations on internal waste streams generally or that it failed to abide
strictly by those regulations in imposing such limitations in this particular case, such are not arguments that
this Court is permitted to decide in this enforcement action. If it desired to dispute ADEM's authority to
impose effluent limitations upon internal waste streams, GSSI should have done so under the procedure set
out in § 22-22A-7, Ala. Code 1975.

violations of its permit and that under 33 U.S.C. § 1369(b)(2) the issue of whether the discharges in question were in fact made into waters of the United State could not be considered because the holder had not challenged its permit under § 1369(b)(1)); General Motors Corp. v. EPA, 168 F.3d 1377 (D.C. Cir. 1999)(denying a petition whereby a defendant sought to challenge the validity of its state-issued permit for stormwater runoff; in enforcement proceedings below, an ALJ recognized that but for the issuance of the permit, the defendant would likely have had no liability at all because subsequent to the permit's issuance, Congress passed a statute stating that no permit was required for stormwater runoff, except in limited circumstances).[16]  However, this Court need not even go that far in order to hold that GSSI is liable, as a matter of law, for the permit violations alleged here by the United States. Regardless of whether the internal waste streams of the facility are themselves waters of the United States, it is undisputed that GSSI discharges into a water of the United States: Black Creek. In order to discharge into Black Creek, GSSI is required to comply with ALL of the terms and conditions of its NPDES permit, which includes effluent limitations upon outfalls 001A, 001C, and 001D, which eventually flow into Black Creek.  Thus, violations of these effluent limitations are violations of the permit and, therefore, of the Clean Water Act.[17]

---

[16]The Court would also note that the fact that an unchallenged NPDES permit actually defines, in most cases wholly and completely, a discharger's obligations under the Clean Water Act may at times work to the discharger's advantage. See, e.g., Atlantic States Legal Found. v. Eastman Kodak, 12 F.3d 353, 357 (2nd Cir. 1993) (holding that polluters may discharge pollutants not specifically listed in their permitts, without violating the Clean Water Act, so long as they comply with the appropriate reporting requirements and abide by any new limitations when imposed on such pollutants); Amigos Bravos v. Molycorp, 1998 WL 792159, 166 F.3d 1220 (10th Cir. 1998) (table), (holding that 33 U.S.C. § 1369(b)(2) precluded an environmental group from attacking in a citizen suit enforcement action, under 33 U.S.C. § 1365, the EPA's ruling that certain discharges of a polluter were not via a point source and therefore did not have to be included in NPDES permit; such an attack had to be made under 33 U.S.C. § 1369(b)(1)).

[17]In support of its position that there are genuine issues of material fact outstanding precluding summary judgment, GSSI cites United States v. Bay-Houston Towing Co., 33 F.Supp. 2d 596 (E.D. Mich. 1999). In that case, the court held that summary judgment was inappropriate because there was a fact question as to whether certain activities of the defendant constituted "discharges" under the Clean Water Act. However, that case is inapposite because the defendant there was accused of discharging without a

GSSI pleads that it was not the original grantee of the 1994 permit imposing limits on the internal waste stream outfalls. GSSI points out it had no legal existence as a corporation until April 21, 1995, some six months after the 1994 permit was issued to its predecessor, and it was therefore impossible for it to prosecute an administrative appeal of the internal waste stream limits under § 22-22A-7(c), Ala. Code 1975. In fact, GSSI makes the conclusory claim that it will be denied due process of law in violation of the Fifth Amendment to the United States Constitution if this Court declines to review the validity of the internal waste stream limits. GSSI cites no authority for this proposition, and the Court concludes that GSSI's claim on this ground is without merit. GSSI explicitly and knowingly assumed the liabilities and obligations of its predecessor in its January 13, 1995, Asset Purchase Agreement. Thus, GSSI now stands in the shoes of its predecessor company in connection with its NPDES permit. Indeed, as the United States points out, GSSI's interpretation of the Clean Water Act would encourage specious corporate transactions in order to challenge or modify permits that would not be subject to such review otherwise. In addition, although under Ala. Admin. Code Reg. 335-6-6-.17(b)(2)(xiv) a "permit may be modified to correct technical mistakes, such as errors in calculation, or mistaken interpretations of law in determining permit conditions," (emphasis added), there is no indication that after GSSI assumed the permit in 1995, it ever applied to ADEM to question the internal waste stream limits in a petition for modification, as the defendant did in Texas Mun. Power Agency v. EPA, 836 F.2d 1482.

Finally, GSSI also claims that it should be excused from having to comply with the permit effluent limitations on the internal waste streams at outfalls 001A, 001B, 001C, and 001D because, GSSI alleges, ADEM representatives made verbal representations that the effluent limitations at these outfalls would not be enforced. GSSI maintains that ADEM advised it that those limits were merely supposed to function as "early warning indications" at

---

permit, not of discharging in violation of its obligations under an NPDES permit, as is the case here.

monitoring points to reduce potential violations at outfall 001. GSSI's Brief at 21. However, on its face, the 1994 permit requires compliance with all its terms and conditions. "Mere verbal representations by officials that certain portions of a permit will not be enforced, without formal modifications in the permit, will not excuse the holder from the terms of that permit." PIRG v. Yates Industries, 757 F.Supp. at 445. Thus, the Court determines that GSSI may not escape liability regarding violations from outfalls on the internal waste streams based upon the alleged verbal assurances of ADEM representatives.

The Court concludes that the permit effluent limitations on outfalls 001A, 001C, and 001D are enforceable, notwithstanding that such outfalls were on internal waste streams of GSSI's facility. Thus, the Court holds that the United States has established that there are no genuine issues of material fact with respect to GSSI's liability for permit violations from outfalls 001A, 001C, and 001D. Accordingly, the Court determines that GSSI's motion for partial summary judgment on the issue of its alleged non-liability for violations concerning internal waste stream effluent limitations is due to be denied. The Court would note, however, that in determining the amount of any penalty assessed under 33 U.S.C. § 1319(b), the Court is to consider "such matters as justice may require," § 1319(d). It is evident that under 40 C.F.R. § 122.2 the facility's internal wastewater streams are not themselves waters of the United States, for the purposes of the Clean Water Act. Moreover, the same waters that are monitored at points along the internal waste streams eventually pass through outfall 001 into Black Creek and are at that point source subject to additional effluent limitations, often for the same pollutants. The Court concludes that these facts may be relevant to whether the amount of the penalty assessed for the violations of internal waste stream effluent limitations should be mitigated. Cf. General Motors Co. v. EPA, 165 F.3d at 1380 ("The ALJ assessed GM a civil penalty . . . half the amount sought by the EPA, because . . . but for the Company's apparently unique status as holder of an NPDES permit for discharges of stormwater it likely would have faced no penalty at all.")

## B. Single Operational Upset Defense

GSSI also argues that the United States has over-counted the number of violations for which GSSI is liable. GSSI contends that a substantial number of its alleged violations were caused by "single operational upsets" and should, GSSI maintains, be counted as single violations. In particular, GSSI claims that "virtually every 'exceedance'" of the dissolved oxygen and temperature parameters alleged by the United States results, GSSI alleges, from the temperature of the intake water at the facility. GSSI argues that seasonal hot weather should be viewed as a single operational upset, and that 643 daily violations should be counted as four violations—one each for the summers of 1995, 1996, 1997, and 1998. GSSI's Brief at 25. GSSI also contends that 95 multi-day violations are attributable to a 20 single causes and should likewise be considered 20 single violations under the single operational upset provision. Finally, GSSI asserts that monthly per-day average effluent limitation violations attributable to a single cause should be counted as 10 single violations, rather than as 307 violations, one for each day of the month in which the monthly limitation was violated.

Title 33, Section § 1319(d) of the United States Code enumerates the factors a court is to consider when determining the amount of a civil penalty for violations of the Clean Water Act. The concluding sentence of that subsection provides: "For purposes of this subsection, a single operational upset which leads to simultaneous violations of more than one pollutant parameter shall be treated as a single violation." 40 C.F.R. § 122.41(n)(1), sets out the definition of "upset" as follows:

> 'Upset' means an exceptional incident in which there is unintentional and temporary noncompliance with technology based permit effluent limitations because of factors beyond the reasonable control of the permittee. An upset does not include noncompliance to the extent caused by operational error, improperly designed treatment facilities, inadequate treatment facilities, lack of preventive maintenance, or careless or improper operation.

Cited in Atlantic States Legal Foundation, Inc. v. Tyson Foods, Inc., 897 F.2d 1128, 1139 n.19

(11th Cir. 1990).

It should be noted that the "single operational upset" defense of § 1319(d), asserted here by GSSI, is different from an "upset" affirmative defense, whereby a polluter may establish a complete defense to liability where the polluter proves several conditions have been satisfied, including that the violator give timely notice of the upset. See 40 C.F.R. § 122.41(n); Ala. Admin. Code Reg. 335-6-6-.12(n). It is not contended that GSSI is eligible for that affirmative defense. Rather, GSSI claims that it can establish the "single operational upset" defense, which is not a complete defense to liability, but relates, rather, only to the amount of penalties the district court may impose. United States v. Smithfield Foods, Inc., 972 F.Supp. 338, 342 n.7 (E.D. Va. 1997).[18] The Court concludes, however, that GSSI has not presented sufficient evidence to establish the single operational upset defense.

GSSI contends that a number of single parameter violations that occurred for a number of consecutive days should be counted as single violations under the single operational upset defense of 33 U.S.C. § 1319(d). For example, GSSI contends that a pipe rupture caused it to violate its permit effluent limitations for zinc on June 28, 29, & 30, 1995 and on July 1 & 2, 1995. The Court acknowledges that a pipe rupture is generally the type of incident that may qualify as an "upset." However, the Court would note that, contrary to GSSI's interpretation, the statutory language of 33 U.S.C. § 1319(d) does not mandate that multiple-day violations of a single pollutant parameter are to be counted as a single violation when such multiple-day violations are attributable to single operational upsets. Rather, the language provides that simultaneous multiple pollutant parameter violations are to be counted as if they were a single pollutant parameter violation where the multiple pollutant parameter violations were caused

---

[18]Indeed, the Court of Appeals for the Third Circuit has recognized that even if a polluter produces sufficient evidence to establish a genuine issue of material fact regarding the "single operational upset" defense, such relates only to the amount of the penalty to be imposed and would not preclude entry of partial summary judgment as to the polluter's liability. See PIRG v. Powell Duffryn Terminals Inc., 913 F.2d 64, 76 & n.20 (3rd Cir. 1990).

by a single operational upset. See, e.g., PIRG v. Elf Atochem North America, Inc., 817 F.Supp. 1164, 1181 (D. N.J. 1993) (holding that violations of parameters for pH, zinc, and total fluorines occurring on a single day were to be counted as one violation, rather than three violations, because they occurred simultaneously as a result of a single operational upset in which 72,000 gallons of partially treated waste water were discharged). In the Court's estimation, the single operational upset defense of § 1319(d) generally is not intended to mitigate violations caused by upsets where the polluter experiences noncompliance with one pollutant parameter due to some extraordinary event and then fails to take immediate remedial steps and thereby allows that noncompliance to continue over an extended period.[19] To hold otherwise would actually give a polluter incentive to drag its heels in curing noncompliance resulting from an upset. Thus, the Court concludes that GSSI cannot establish the single operational upset defense with respect to the multiple-day zinc violations allegedly caused by the ruptured pipe.

GSSI also asserts that it experienced violations for single pollutant parameters for consecutive days from other causes, which GSSI claims were upsets. Those causes were: "Oil droplets were surfacing between the final skimmer and the sample point," "Leaking seal on pump, leak on recirculating pump," "Malfunctions in Coke Plant," "Leak in a flux line at that galvanize line allowing zinc ammonium chloride to bypass the treatment plant," "Installing pH control system in process of fine tuning the system," and "Zinc Ammonium Chloride escaping treatment system." In addition to the fact GSSI does not claim that the violations caused by such were multiple-parameter violations, as opposed to consecutive day single parameter

---

[19]The Court would acknowledge that perhaps there may be some circumstances where multiple day violations should be counted as a single violation under the single operational upset defense of § 1319(d). See, e.g., Allen County Citizens v. BP Oil Co., 762 F.Supp. 733, 745 (N.D. Ohio 1991) (recognizing that two violations of limits on Biological Oxygen Demand were to be deemed a single violation under the single operational upset defense where it was "undisputed" that the violations were caused by a "once in a 25-year storm event"). However, such is not evident from the statutory language.

violations, the Court concludes that GSSI has failed to present sufficient evidence indicating that these events were either exceptional or beyond its reasonable control. See NRDC v. Texaco Refining and Marketing, Inc., 800 F.Supp. 1, 17 (D. Del. 1992), aff'd in part, rev'd in part on other grounds, 2 F.3d 493 (3rd Cir. 1993). Thus, the Court concludes that these are not upsets.

GSSI also contends that the summers in Alabama should be counted as single operational upsets and reduce 643 daily violations to 4 violations. The Court disagrees. Violations that are long standing, continuous, or reoccur every year at the same time are generally not considered to result from "exceptional incidents" and such noncompliance is not merely "temporary" and therefore such violations do not qualify as "upsets." See, e.g., PIRG v. U.S. Metals Refining Co., 681 F.Supp. 237, 244 (D. N.J. 1987)(holding that violations that occurred "winter after winter after winter," were not upsets and that to hold otherwise would not encourage the defendant "to examine the treatment facility and to take steps to prevent future noncompliance")(citations omitted); Powell Duffryn, 913 F.2d at 77 (holding "[i]t is disingenuous at best for [the defendant] to argue that it was in a near continual state of operational upset for the six years of violations involved in this suit"); Student Public Interest Research of N.J. v. Jersey Central Power & Light Co., 642 F.Supp. 103, 108 (D. N.J. 1986); International Union, United Auto, Aerospace and Agr. Implement Workers of America, AFL-CIO v. Amerace Corp., 740 F.Supp. 1072, 1082-83 (D. N.J. 1990); (both holding that continuous, numerous violations were not upsets). The Court concludes that GSSI cannot successfully maintain that summer in Alabama constitutes an "exceptional incident" qualifying for the single operational upset defense.

Finally, GSSI claims that § 1319(d) requires that every one of its daily maximum violations that are attributable to a single cause should be counted as only one violation for each cause. GSSI similarly contends that the same statute operates to preclude the counting of monthly violations of per day average effluent limitations as violations occurring each day of the

month, where the monthly violation has a single cause.[20]  Implicit in both of these arguments is the assumption that the single operational upset defense transforms all violations traceable to a single cause into but a single violation.  The Court finds, however, that this assumption is completely unwarranted.  The single operational upset defense only applies to violations that are caused by "upsets," not violations that may be traced merely to some single cause.  The defendant must show that particular violations were the result of a specific cause and that such cause qualifies as an upset.  Thus, the Court rejects GSSI's arguments regarding the counting of monthly per-day-average violations and the daily violations for which GSSI offers no specific cause in support of its claim of upset.  The Court concludes that GSSI has failed to present sufficient evidence to sustain the single operational upset defense as to any violation for which the United States seeks to establish liability in its motion for partial summary judgment.

## CONCLUSION

Based on the foregoing, the Court concludes that the United States satisfied its burden to show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law on GSSI's liability by submitting evidence showing that GSSI is liable for 1000 violations of its NPDES permit, constituting 4,290 days of violation.  GSSI failed to present sufficient evidence indicating that any of the violations in question are subject to the single operational upset defense, nor evidence to otherwise establish that a fact question exists that would preclude the entry of judgment as a matter of law against it for violations claimed by the United States.  Accordingly, the Court concludes that the United States motion for partial summary judgment on the issue of GSSI's liability for the 1000 alleged violations,[21] comprising

---

[20]In Tyson Foods, Inc., the United States Court of Appeals for the Eleventh Circuit held that monthly per-day-average violations of a pollutant are to be counted as one violation for each day of the month in which the average was violated, although daily maximum violations for that same pollutant occurring in the same month would not be counted.  See 897 F.2d at 1139-40.

[21]See note 10, supra.

4,290 days of violation, (Doc. 43) is due to be GRANTED, and the GSSI motion for partial summary judgment (Doc. 51) is due to be DENIED.  <u>Once again, however, the court would note that the amount of the penalty for violations of the effluent limitations on outfalls along GSSI's internal waste streams might be subject to mitigation, given that those outfalls do not discharge directly into waters of the United States.</u>  See page 17 of this Memorandum Opinion.

DONE and ORDERED this 8th _____ day of June 1999

_____
H. DEAN BUTTRAM, JR.
UNITED STATES DISTRICT JUDGE